**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724<br>No. 16-MD-2724-CMR<br>HON. CYNTHIA M. RUFE |
| _____ | |
| IN RE: AMITRIPTYLINE CASES | |
| _____ | |
| THIS DOCUMENT RELATES TO:<br><br>*ALL INDIRECT RESELLER PLAINTIFF (IRP) ACTIONS* | 16-AM-27243<br><br>Civil Case No. 17-cv-3807<br><br>**CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

**INDIRECT RESELLER PLAINTIFFS'**
**AMENDED CLASS ACTION COMPLAINT**

**FILED WITH REDACTIONS – PUBLIC VERSION**

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ..................................................................................... 1

II.    ONGOING INVESTIGATIONS ............................................................................... 3

III.   THE ROLE OF INDEPENDENT PHARMACIES ................................................. 9

IV.    JURISDICTION AND VENUE ............................................................................... 9

V.     PARTIES ................................................................................................................. 11

       A.     Plaintiffs .................................................................................................... 11

       B.     Defendants ................................................................................................. 12

       C.     Co-Conspirators ........................................................................................ 13

VI.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE ..................... 13

VII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY ................................. 14

       A.     Generic drugs are commodity products that compete on price ................. 14

       B.     Pricing of generic drugs makes unilateral price increases risky .............. 17

VIII.  THE GENERIC AMITRIPTYLINE CONSPIRACY ........................................... 19

       A.     Congressional responses to Amitriptyline price increases ....................... 19

       B.     The Amitriptyline market .......................................................................... 21

       C.     Amitriptyline price increases .................................................................... 23

       D.     Activities with respect to the Amitriptyline conspiracy .......................... 31

       E.     Defendants' opportunities to conspire ...................................................... 32

       F.     Defendants' own acknowledgments of lack of generic drug competition .............. 42

       G.     Defendants' concerted efforts to increase prices for Amitriptyline yielded
              supracompetitive profits ............................................................................ 43

       H.     Factors increasing the market's susceptibility to collusion ..................... 44

              1.     Industry concentration ................................................................... 45

              2.     Barriers to entry ............................................................................. 46

              3.     Inelastic demand ............................................................................ 47

              4.     Lack of substitutes ......................................................................... 48

              5.     Standardized product with high degree of interchangeability ...... 49

              6.     Inter-competitor contacts and communications ............................. 50

IX.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .............. 54

FILED WITH REDACTIONS – PUBLIC VERSION

A.   The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy ......................................................... 54

B.   Fraudulent concealment tolled the statutes of limitations ........................................ 55

1.   Active concealment of the conspiracy .................... 56

2.   Plaintiffs exercised reasonable diligence ................... 57

X.   CONTINUING VIOLATIONS ................................................. 57

XI.   DEFENDANTS' ANTITRUST VIOLATIONS .................................. 58

XII.   CLASS ACTION ALLEGATIONS ............................................ 60

XIII.   CAUSES OF ACTION ...................................................... 64

XIV.   PRAYER FOR RELIEF ..................................................... 108

XV.   JURY DEMAND .......................................................... 110

**FILED WITH REDACTIONS – PUBLIC VERSION**

# I.     <u>NATURE OF THE ACTION</u>

1.      This action brings claims on behalf of pharmacies ("Indirect Reseller Plaintiffs," "independent pharmacies," or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Amitriptyline Hydrochloride tablets ("Amitriptyline").

2.      Recognized as an "Essential Medicine" by the World Health Organization, Amitriptyline is prescribed to treat symptoms of depression as well as chronic pain from migraine headaches and other medical syndromes. Amitriptyline is a well-established medication that was first approved for patient use in 1961. Generic versions of Amitriptyline have been available in the United States since the 1970s.

3.      For many years, competition among the small group of sellers of generic Amitriptyline kept prices stable, at low levels. But starting in May 2014, Defendants, who dominate the market for Amitriptyline, abruptly and raised their respective Amitriptyline prices. During the summer of 2014, prices of Amitriptyline tablets increased by almost 1,500% on average, with increases of almost 2,400% for one dosage strength. Prices remain at supracompetitive levels today—Amitriptyline now costs approximately 1,240% more than it cost before the price hike. In fact, the U.S. Government Accountability Office ("GAO") identified Amitriptyline as having "experienced an extraordinary price increase."[1]

4.      The price increases imposed by Defendant manufacturers of Amitriptyline cannot be explained by supply shortages or any other market feature or shock. Nor were they the result of

---

[1] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 12, 2016) ("GAO Report"), at Appx. III, *available at* http://www.gao.gov/products/GAO-16-706.

**FILED WITH REDACTIONS – PUBLIC VERSION**

unilateral business decisions. Instead, the significant increases in the prices of Amitriptyline were the result of an illegal agreement among Defendants to fix prices.

5.      Defendants' unlawful and anticompetitive conduct in the Amitriptyline market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

6.      ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

7.      Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Amitriptyline —have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

8.      An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of Doxycycline Hyclate and Glyburide. But DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course of its investigation into those drugs also "implicates . . . a significant number of the Defendants . . . . [and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

---

[2] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.
[3] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

**FILED WITH REDACTIONS – PUBLIC VERSION**

9.      The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of antitrust violations in the generic drug industry, confirms that there is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[4]

10.     The Defendants named here—Endo/Par, Mylan, and Sandoz—have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.

11.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below. Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of all privately held pharmacies in the United States and its territories that purchased generic Amitriptyline products manufactured by any Defendant, from May 1, 2014 to the present ("Class Period"), and (b) a damages class of all privately-held pharmacies in certain states that purchased generic Amitriptyline products manufactured by any Defendant, from May 1, 2014 to the present.

## II.      ONGOING INVESTIGATIONS

12.     Now in its third year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government

---

[4] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

**FILED WITH REDACTIONS – PUBLIC VERSION**

alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[5]

13.    On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[6] Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[7] As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation. More criminal charges and guilty pleas are expected to follow.[8]

14.    Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader. The investigations reportedly cover two dozen drugs and more than a dozen manufacturers. Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[9]

---

[5] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[6] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

[7] DOJ Press Release (Dec. 14, 2016), *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[8] *See, e.g.,* Eric Kroh, "Generic Drug Price-Fixing Suits Just Tip Of The Iceberg," Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg.

[9] PaRR Report, "DoJ Believes Collusion over Generic Drug Prices Widespread" (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

4

**FILED WITH REDACTIONS – PUBLIC VERSION**

15.     According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever. *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.). As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[10]

16.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least sixteen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").

17.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant. DOJ does not empanel grand juries lightly. The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make

---

[10] *Id.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[11]

18.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[12]

19.     Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant: "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[13] As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[14]

---

[11] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

[12] Mark Rosman & Seth Silber, "DOJ's Investigation Into Generic Pharma Pricing Is Unusual," Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[13] Richard Vanderford, "Generic Pharma Investigation Still Broad, Prosecutor Says," mLex (Feb. 21, 2017).

[14] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download.

6

20.     In addition to the federal criminal investigation, after years of investigation and on the basis of millions of documents as well as witness testimony, the Attorneys General of at least forty-seven States have filed a complaint in this MDL alleging an overarching conspiracy among generic drug manufacturers to fix prices and allocate customers. The States have made clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors" [15] and have stated in open court that complaints involving additional drugs and manufacturers will be filed in 2019.

21.     The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications. "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors." This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[16]

22.     The indictments and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg. The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[17]

23.     Defendants are known targets of the price-fixing investigations. In December 2014,

---

[15] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Amended Complaint).

[16] State AG Amended Compl. ¶ 7.

[17] State AG Amended Compl. ¶ 1.

FILED WITH REDACTIONS – PUBLIC VERSION

Par Pharmaceutical Holdings, Inc. received a subpoena from the antitrust division of the United States Department of Justice concerning the company's pricing of digoxin and doxycycline. In December 2015, the Connecticut AG issued a subpoena to Endo Pharmaceuticals, Inc. "requesting information regarding pricing of certain of its generic products, including . . . Amitriptyline Hydrochloride."[18] And Mylan has similarly disclosed that in December 2015, it too received a subpoena and interrogatories from the Connecticut AG "relating to the marketing, pricing and sale of certain of the Company's generic products . . . ."[19] And in March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products…and related communications with competitors."[20]

24.    Plaintiffs do not yet have access to all of the information available to the government enforcement agencies. What is known is that starting in May 2014, after representatives of the Defendants attended meetings of the Generic Pharmaceutical Association, Defendants abruptly and sharply raised their respective Amitriptyline prices to nearly identical levels. The allegations herein demonstrate that the large and unprecedented price increases for Amitriptyline cannot be explained by normal, competitive market forces. The explanation is collusion.

---

[18] Endo, SEC Form 8-K Exhibit 99.1 (Apr. 11, 2017), *available at* https://www.sec.gov/Archives/edgar/data/1593034/000119312517119039/d374362dex991.htm.

[19] Mylan, SEC Form 10-Q (Apr. 27, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000056/myl10q_20160331xdoc.htm.

[20] Novartis 2016 Financial Report, at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

### III.   THE ROLE OF INDEPENDENT PHARMACIES

25.     There are approximately 22,000 privately-owned independent pharmacies in the United States, as contrasted with chain drug stores such as CVS, Walgreens, and Rite Aid, and mass merchandiser or supermarket drug stores such as Wal-Mart, Target and Kroger. Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

26.     The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to independent pharmacies. Independent pharmacies rarely purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health Inc., or AmerisourceBergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the manufacturer's price. Independent pharmacies, lacking the sales volume heft and wholesaler relationships enjoyed by their much larger competitors, have no meaningful ability to negotiate these acquisition costs. They must pay the price the wholesaler charges. As a result, when drug manufacturers collude to allocate customers or raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs.

### IV.   JURISDICTION AND VENUE

27.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

28.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

FILED WITH REDACTIONS – PUBLIC VERSION

29.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367; and by 28 U.S.C. 1446(a).

30.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[21]

31.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Amitriptyline throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably

---

[21] DOJ, Antitrust Division Manual at III-83.

FILED WITH REDACTIONS – PUBLIC VERSION

have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

<b>V.      PARTIES</b>

**A.      Plaintiffs**

32.     Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy indirectly purchased and continues to purchase Defendants' generic Amitriptyline products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

33.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased and continues to purchase Defendants' generic Amitriptyline products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

34.     Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic Amitriptyline products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

35.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased and continues to purchase Defendants' generic Amitriptyline products at supracompetitive prices during the

11

Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

**B.      Defendants**

36.      Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

37.      Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. Mylan Inc. and Mylan Pharmaceuticals Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company. In this complaint, Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. are together referred to as "Mylan." During the Class Period, Mylan sold Amitriptyline to purchasers in this District and throughout the United States.

38.      Defendant Par Pharmaceutical, Inc. ("Par") is a New York corporation with its principal place of business in Chestnut Ridge, New York. Par is a subsidiary of Endo International plc ("Endo"), an Irish pharmaceutical company. In September 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Par, from a private investment firm for about $8 billion in cash and stock. At that time Endo created a combined U.S. Generics segment that included Par, and Endo's subsidiary Qualitest, naming the segment Par Pharmaceutical, Inc. During the Class Period, Par sold Amitriptyline to purchasers in this District and throughout the United States.

39.      Defendant Sandoz, a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is a subsidiary of Novartis International AG, a Swiss pharmaceutical company. During the Class Period, Sandoz sold Amitriptyline to purchasers in this District and throughout the United States

**FILED WITH REDACTIONS – PUBLIC VERSION**

C. **Co-Conspirators**

40.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein, although their identities are presently unknown to the Plaintiffs. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein. Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VI.     INTERSTATE AND INTRASTATE TRADE AND COMMERCE

41.     During the Class Period, Defendants sold and distributed generic Amitriptyline in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

42.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Amitriptyline, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

43.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, drug wholesalers within each state and territory were foreclosed from offering less expensive generic Amitriptyline to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

FILED WITH REDACTIONS – PUBLIC VERSION

## VII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.   Generic drugs are commodity products that compete on price

44.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[22] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[23]

45.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[24] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[25]

46.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[26] And that may be conservative. According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[27] Mature

---

[22] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[23] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[24] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[25] *Id.*

[26] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800.

[27] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

14

**FILED WITH REDACTIONS – PUBLIC VERSION**

generic markets—like that of Amitriptyline —typically have several manufacturers that compete for sales, hence keeping prices in check.

47.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs. Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[28]

48.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

49.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

50.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of

---

[28] GPhA Report at 1.

FILED WITH REDACTIONS – PUBLIC VERSION

price."[29] In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

51.     It is well-established that competition among generic manufacturers drives down price. Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales. When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the cheaper alternatives. Over time, the price of a generic drug approaches the manufacturers' marginal costs. As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

**Generic Competition and Drug Prices**



Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

52.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share. A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a

---

[29] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[30]

53.     When there are multiple generic manufacturers in an established generic market— as with Amitriptyline—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.     Pricing of generic drugs makes unilateral price increases risky**

54.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured. The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies. These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

55.     Because the prices paid by purchasers of generic drugs differ at each level of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious. Marketwide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire

---

[30] GAO Report at 23.

**FILED WITH REDACTIONS – PUBLIC VERSION**

prescription . . . drugs."[31] "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[32] In effect, NADAC is "a single national average."[33] Thus, NADAC is one way to track general price trends in the marketplace.

56.    While NADAC provides the average price level across all manufacturers of a given drug, other price measures are manufacturer-specific. Drug manufacturers typically report benchmarks—like Wholesale Acquisition Cost ("WAC")—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry. The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price, which is sometimes subject to discounts. In order to track manufacturer-specific pricing, this complaint uses QuintilesIMS's National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.[34]

57.    When third-party payers (e.g., health plans) pay pharmacies to dispense drugs to their covered patients, the amount is typically determined with reference to a benchmark or list price like a WAC. Some third-party payers and PBMs have implemented their own individual caps—Maximum Allowable Cost ("MAC")—that set the maximum amounts they will pay pharmacies for some generic drugs, regardless of the pharmacies' acquisition costs. A pharmacy

---

[31] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[32] *Id.* at 15.

[33] *Id.*

[34] IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

must often dispense the drug at a loss if it cannot find a wholesaler offering the drug at a price or below the MAC cap.

58.     Although MAC caps do not apply directly to manufacturers, these caps impose a restraint on manufacturers' prices. The MAC cap essentially limits the pharmacies' discretion to adjust retail prices upwards, so pharmacies are incentivized to buy from the cheapest wholesaler and wholesalers to buy from cheapest manufacturer. This additional pressure on prices means a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price. Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales. In a market with MAC caps, it is unlikely that a generic drug manufacturer would risk raising its price unless it has been agreed with competitors that they will raise their prices, too.

## VIII.   THE GENERIC AMITRIPTYLINE CONSPIRACY

### A.     Congressional responses to Amitriptyline price increases

59.     In addition to the investigations by DOJ and the Connecticut AG, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals. These concerns were prompted by the very real hardship suffered by American patients as a result of the unprecedented price increases. As noted above, the GAO identified Amitriptyline as one of the drugs that had experienced extraordinary price increases.

60.     In the fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of 10 drugs that had experienced extraordinary price

increases. Endo, Mylan, and Par were among those manufacturers. Six of those drugs, including Amitriptyline, are now the subject of complaints in this MDL.[35]

61.     In November 2014, the Senate Subcommittee on Primary Health and Aging conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing"). The presidents and CEOs of three generic manufacturers refused to testify at the hearing, but pharmaceutical industry experts testified that generic drug prices were not following traditional pricing patterns and were instead undergoing substantial increases.[36]

62.     Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs. The request letter identified the 100 mg and 150 mg dosages of generic Amitriptyline specifically.[37] The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far out-stripped inflation.[38]

63.     In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price

---

[35] Senator Sanders, Press Release, "Congress Investigating Why Generic Drug Prices Are Skyrocketing" (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[36] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced.

[37] https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[38] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

20

Increases."[39] The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[40] And this was the case for most generics. But it identified numerous drugs, including Amitriptyline, that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[41]

### B.   The Amitriptyline market

64.   The market for generic Amitriptyline is mature, and Defendants that operate in that market can only gain market share by competing on price.

65.   Recognized as an "Essential Medicine" by the World Health Organization, Amitriptyline is prescribed to treat symptoms of depression as well as chronic pain from migraine headaches and other medical syndromes. Amitriptyline is a tricyclic antidepressant, which were among the earliest antidepressants developed. These drugs ease depression by altering brain chemistry to increase levels of the neurotransmitters norepinephrine and serotonin, which are known to regulate mood. Amitriptyline is one of the most frequently prescribed tricyclic antidepressants in the United States.

66.   Amitriptyline is the generic version of the brand name drug Elavil, a tricyclic antidepressant approved for sale be AstraZeneca by the U.S. Food and Drug Administration in 1961.[42] AstraZeneca discontinued this brand version in 2003.[43] Other manufacturers also marketed

---

[39] GAO Report.

[40] *Id.* at 23-25.

[41] *Id.* at 1 & Appendix III.

[42] Drugs@FDA Database, NDA 012703, *available at* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=0 12703.

[43] Drug Shortages Presentation, *available at* https://www.fda.gov/ohrms/dockets/ac/06/briefing/2006_4204B1_06_FDA.DrugShortages.pdf.

21

branded generic versions of the drug, such as Amitid, Amitril, and Endep, but each of these had been discontinued by the late 2000s.

67.     Generic versions of Amitriptyline have been available for purchase in the United States since the 1970s.[44] At the time of Defendants' price increases in May 2014, only the Defendants had active approvals from the FDA to sell Amitriptyline. Accord Healthcare entered the market several months after the price hikes. According to the FDA's Orange Book, only the Defendants and Accord currently have FDA approval to sell Amitriptyline.

68.     According to data from QuintilesIMS ("IMS"),[45] total sales of Amitriptyline tablets were approximately $15-17 million per year in 2012 and 2013. In 2014, sales jumped to $99 million, and again nearly doubled in 2015, up to $180 million.

69.     At all relevant times, Defendants had substantial market power with respect to Amitriptyline. Defendants exercised this power to maintain supracompetitive prices for Amitriptyline without losing so many sales as to make the elevated price unprofitable.

70.     Defendants sold Amitriptyline at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

71.     Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for Amitriptyline.

---

[44] *See, e.g*., Drugs@FDA Database, ANDA 086009, *available at* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=086009.

[45] QuintilesIMS, formerly known as IMS Health, provides data to and about the pharmaceutical industry.

FILED WITH REDACTIONS – PUBLIC VERSION

C.    **Amitriptyline price increases**

72.    Competition in the Amitriptyline market had caused prices to stabilize and remain relatively low from at least January 2011 until Defendants raised prices in May 2014. Defendants' May 2014 price increases represented a departure from the stable pricing of prior years and from ordinary pricing practices, and are indicative of collusion.

73.    Data from the National Average Drug Acquisition Cost ("NADAC")[46] for Amitriptyline show the low and stable prices of Amitriptyline characteristic of the market prior to the Defendants' price hikes, and the huge spike in price that occurred abruptly in May 2014. Since that time, Defendants have continued to charge supracompetitive prices.



---

[46] NADAC is a measure of the cost of drugs developed by the National Association of State Medicaid Directors to set a single national pricing benchmark based on average drug acquisition costs. NADAC price data is precise and accurate, according to the Centers for Medicare and Medicaid Services.

23

**FILED WITH REDACTIONS – PUBLIC VERSION**



74.    As the charts illustrate, for several years prior to Defendants' price increases the prices of Amitriptyline remained flat and at competitive levels. Then, starting in May of 2014, the average price of Amitriptyline abruptly increased by approximately 1,500%, with certain dosages increasing as much as 2,400% over the same time period.

75.    The market-wide Amitriptyline price increases are the result of all of the Defendants raising their prices at substantially the same time to substantially similar levels in the summer of 2014.

76.    The following graphs show the Defendants' wholesale acquisition cost ("WAC") prices, which act as list prices in the pharmaceutical industry. These graphs, which use data from IMS, depict the Defendants' collusive behavior: beginning in mid-2014, Mylan, Par, and Sandoz each raised their WAC prices to essentially the same level.

FILED WITH REDACTIONS – PUBLIC VERSION



77.     Defendants' increases of Amitriptyline WAC prices were accompanied by corresponding increases of Defendants' net selling prices, referred to by IMS as NSP prices. On average, Defendants increased their NSP prices of Amitriptyline by 1,000% in just four months, between April and August 2014. Some individual Defendants' price increases for specific dosage

**FILED WITH REDACTIONS – PUBLIC VERSION**

strengths during this time period were much greater—as high as 1,648%. Furthermore, Defendants' Amitriptyline NSP prices remained artificially elevated long after the initial increases. As of November 2016, Defendants' Amitriptyline prices were 950% higher on average than the prices in April 2014.

78.     The following graphs show the IMS NSP prices charged by Mylan, Par, and Sandoz for Amitriptyline, including their coordinated increases in the summer of 2014.



**FILED WITH REDACTIONS – PUBLIC VERSION**



27



28

FILED WITH REDACTIONS – PUBLIC VERSION



79.     Defendants' price increases for Amitriptyline resulted in corresponding increases to the prices paid by Plaintiffs and members of the proposed Classes. Corresponding increases in Amitriptyline's transactional prices demonstrate that increased WAC prices translate to increases in the prices paid by Plaintiffs.

80.     No apparent, reasonable competitive justifications explain these abrupt shifts in pricing conduct. To the contrary, anticompetitive activity explains the skyrocketing Amitriptyline prices. As Richard Evans at Sector & Sovereign Research recently wrote: "[a] plausible explanation [for price increases of generic drugs] is that generic manufacturers, having fallen to near historic low levels of financial performance, are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."

FILED WITH REDACTIONS – PUBLIC VERSION

81.     The price increases cannot be attributed to the need to fund research and development. Generic pharmaceutical firms do not incur the large research and development costs that brand firms absorb in developing new drugs. Moreover, the costs associated with developing and obtaining FDA approval for Amitriptyline were incurred over 50 years ago when the drug was first introduced to the market.

82.     Defendants' enormous price increases were not due to supply disruptions. With regard to drug shortages, federal law requires drug manufacturers to report potential shortages to the FDA, the reasons therefor, and the expected duration of the shortage,[47] but no supply disruption was reported by the relevant Defendants with respect to Amitriptyline in the summer of 2014. Amitriptyline does not appear in the American Society of Health-System Pharmacists databases of current and resolved drug shortages. There were also no significant decreases in Defendants' overall sales volume that might indicate a shortage in the availability of Amitriptyline's active ingredient.

83.     Changes in demand for Amitriptyline also do not justify the price increases. In 2012, Amitriptyline was added to the American Geriatrics Society's Beers list of drugs that pose a high risk of adverse effects in seniors. Seniors taking Amitriptyline risk experiencing strong anticholinergic effects, such as confusion, blurred vision, drowsiness, and hallucination. When prescription drugs are classified as high risk, doctors tend to prescribe them to seniors less, causing total demand to decline. Lower total demand generally causes prices to drop or remain stable, assuming supply does not also substantially decline. Here, however, no apparent drop in demand or supply would explain the dramatic increase in Amitriptyline prices.

---

[47] *See* FDA, Frequently Asked Questions about Drug Shortages, *available at* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm#q.

**FILED WITH REDACTIONS – PUBLIC VERSION**

#### D.    Activities with respect to the Amitriptyline conspiracy

84.    Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices.

85.    Defendants engaged in a conspiracy to raise and fix the prices of Amitriptyline tablets. Defendants reached agreement to raise their prices, and beginning in May 2014 implemented these price hikes as described above. This pricing behavior marked a drastic departure from Defendants' previous pricing practices with respect to Amitriptyline.

86.    The price increases closely followed Defendants' participation in the 2014 Annual Meeting of the NACDS in Scottsdale, Arizona. According to NACDS records, representatives of Endo/Par, Mylan, and Sandoz attended the meeting. In the months prior to implementing their agreement, Defendants also attended the annual meetings of the Generic Pharmaceutical Association and Efficient Collaborative Retail Marketing in February 2014.

87.    In a competitive market, sellers have incentives to cut prices to maintain or increase market share. It would be economically irrational for an individual seller to drastically increase prices without assurances that its rivals would do the same. Absent such assurances, the seller would risk a loss of market share that would more than offset the higher prices it was charging. Defendants knew that they would not lose market share, however, because they had agreed to each raise prices so that customers had no cheaper source of supply and had no choice but to pay the skyrocketing prices for Amitriptyline. As such, increasing prices would be economically irrational for a single Defendant, but increasing prices together as a result of collusion proved extremely profitable for Defendants.

88.    In fact, another company, Accord Healthcare, entered the Amitriptyline market a few months after Defendants' price hikes, subsequently lowered its prices, and increased its market

FILED WITH REDACTIONS – PUBLIC VERSION

share. The fact that Accord was able to enter the market and capture market share by undercutting the Defendants' prices shows that it would not have been economically rational for one company to raise its price without others doing the same, lest they lose market share to lower-priced competitors.

### E.   Defendants' opportunities to conspire

89.   In order to be successful, collusive agreements require a level of trust among the conspirators. While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.

90.   During the Class Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices at which Amitriptyline would be sold, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Amitriptyline.

91.   Beginning in May 2014, Defendants collectively caused the price of Amitriptyline to increase dramatically. Defendants' conduct cannot be explained by normal competitive forces. It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Amitriptyline in the United States. The agreement was furthered through Defendants' participation in trade association meetings and events, including the 2014 Annual Meeting of the NACDS at The Phoenician resort in Scottsdale, Arizona, which took place April 26-29, shortly before Defendants executed their price increases.

92.   To sustain a conspiracy, the conspirators must periodically communicate to ensure that all are adhering to the collective scheme. Here, these communications occurred primarily

FILED WITH REDACTIONS – PUBLIC VERSION

through (1) trade association meetings and conferences, and (2) private meetings, dinners and outings among smaller groups of generic drug manufacturers.

93.    The purpose of these secret, conspiratorial meetings, discussions, and communications was to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price-fixing, and market and customer allocation scheme.

94.    The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade organizations have been used as forums for collusion between sales personnel among competing generic drug companies.[48]

95.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Amitriptyline, and to allocate markets and customers for Amitriptyline, ███████████████████████████████████

96.    The GPhA is the "leading trade association for generic drug manufacturers."[49] GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

---

[48] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FiercePharma (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[49] Ass'n for Accessible Medicines, *The Association*, *available at* http://www.gphaonline.org/about/the-gpha-association. While MDL 2724 has been pending, the GPhA changed its name to the Association for Accessible Medicines. *See* Russell Redman, *New name for Generic Pharmaceutical Association*, Chain Drug Review (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-generic-pharmaceutical-association/.

FILED WITH REDACTIONS – PUBLIC VERSION

97.     GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[50] GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

98.     Defendants are current or recent regular members of the GPhA. Regular Members "are corporations, partnerships or other legal entities whose primary United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[51]

99.     Several of Defendants' high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

(a)     **2013 Board of Directors**: Don DeGolyer, President and CEO of Sandoz US, and Tony Mauro, President of Mylan North America;

(b)     **2014 Board of Directors**: Peter Goldschmidt, President of Sandoz US; Tony Mauro, President of Mylan North America;

(c)     **2015 Board of Directors**: Peter Goldschmidt, President of Sandoz US, Marcie McClintic Coates, VP and Head of Global Regulatory Affairs for Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals;

(d)     **2016 Board of Directors**: Heather Bresch, CEO of Mylan N.V.; Peter Goldschmidt, President of Sandoz US; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals.

---

[50] Ass'n for Accessible Medicines, *Membership*, *available at* http://www.gphaonline.org/about/membership.

[51] *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION

100.    Former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to the price fixing and other anticompetitive activity concerning generic pharmaceuticals, also served on GPhA's Board of Directors.

101.    Defendants (or their affiliates) attended the GPhA meetings shortly before and during the Class Period. These meetings provided Defendants opportunities to collude.

| Event | Attendees |
|---|---|
| 2013 GPhA Annual Meeting<br><br>February 20-22, 2013<br>Orlando, Florida | • Endo Health Solutions<br>• Endo Pharmaceuticals<br>• Mylan Inc.<br>• Mylan North America<br>• Mylan Pharmaceuticals Inc.<br>• Par Pharmaceutical Companies<br>• Qualitest<br>• Sandoz Inc.<br>• Sandoz International GmbH |
| 2013 GPhA CMC Workshop<br><br>June 4-5, 2013<br>Bethesda, Maryland | • Endo (Qualitest Pharmaceuticals)<br>• Mylan Institutional<br>• Mylan Pharmaceuticals Inc. North America<br>• Mylan Technologies Inc.<br>• Par Pharmaceutical Inc.<br>• Qualitest subsidiary of Endo Pharma<br>• Sandoz Inc.<br>• Sandoz International GmbH<br>• Sandoz Pharmaceuticals |
| 2013 GPhA Fall Technical Conference<br><br>October 28-30, 2013<br>Bethesda, Maryland | • Endo (Qualitest Pharmaceuticals)<br>• Mylan Institutional<br>• Mylan Laboratories LTD<br>• Mylan Pharmaceuticals Inc.<br>• Mylan Technologies, Inc.<br>• Par Formulations Pvt Ltd<br>• Par Pharmaceutical Inc.<br>• Qualitest<br>• Sandoz Canada Inc.<br>• Sandoz GmbH<br>• Sandoz Inc. |

FILED WITH REDACTIONS – PUBLIC VERSION

| Event | Attendees |
|---|---|
| 2014 GPhA Annual Meeting<br><br>February 19-21, 2014<br>Orlando, Florida | • Endo Pharmaceuticals<br>• Mylan North America<br>• Mylan Pharmaceuticals Inc.<br>• Mylan Pharmaceuticals ULC<br>• Mylan, Inc.<br>• Par Pharmaceutical Companies, Inc.<br>• Qualitest<br>• Sandoz |
| 2014 GPhA CMC Workshop<br><br>North Bethesda, Maryland<br>June 3-4, 2014 | • Mylan Inc.<br>• Mylan Institutional<br>• Mylan Pharmaceuticals<br>• Mylan Technologies Inc.<br>• Par Pharmaceutical Inc.<br>• Par Sterile Products, LLC<br>• Qualitest Pharmaceuticals<br>• Sandoz Inc.<br>• Sandoz International GmbH<br>• Sandoz Oncology Injectables |
| 2014 GPhA Fall Technical Conference<br><br>October 27-29, 2014<br>North Bethesda, Maryland | • Mylan Inc.<br>• Mylan Institutional<br>• Mylan Laboratories<br>• Mylan Laboratories Limited<br>• Mylan Pharma UK Ltd<br>• Mylan Pharmaceuticals Inc.<br>• Mylan Pharmaceuticals<br>• Mylan Technologies Inc.<br>• Par Pharmaceutical<br>• Par Sterile Products, LLC<br>• Qualitest Pharmaceuticals<br>• Qualitest subsidiary of Endo Pharma<br>• Sandoz GmbH<br>• Sandoz Inc. |
| 2015 GPhA Annual Meeting<br><br>February 9-11, 2015<br>Miami Beach, Florida | • Mylan Inc.<br>• Mylan Pharmaceuticals Inc.<br>• Par Pharmaceutical, Inc.<br>• Qualitest Pharmaceuticals, Inc.<br>• Endo Pharmaceutical<br>• Sandoz Biopharmaceuticals<br>• Sandoz Inc. |

FILED WITH REDACTIONS – PUBLIC VERSION

| Event | Attendees |
|-------|-----------|
| 2015 GPhA CMC Workshop<br><br>June 9-10, 2015<br>North Bethesda, Maryland | • Mylan Inc.<br>• Mylan Institutional Inc.<br>• Mylan Pharma UK Ltd<br>• Mylan Technologies Inc.<br>• Par Pharmaceutical Companies Inc.<br>• Par Pharmaceuticals<br>• Par Sterile Products<br>• Qualitest Pharmaceuticals<br>• Sandoz Inc.<br>• Sandoz International GmbH |
| 2015 GPhA Fall Technical Conference<br><br>November 2-4, 2015<br>North Bethesda, Maryland | • Mylan Inc.<br>• Mylan Institutional<br>• Mylan Laboratories Limited<br>• Mylan Pharmaceuticals, Inc.<br>• Mylan Technologies Inc.<br>• Par Pharmaceutical Inc.<br>• Par Sterile Products, LLC<br>• Sandoz Inc. |

102. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████

103.     In addition to GPhA ████████, Defendants participate in the NACDS, a national

trade association representing chain pharmacies. Its members include drug manufacturers,

wholesalers, and retail pharmacies. NACDS holds regular industry events, including annual and

FILED WITH REDACTIONS – PUBLIC VERSION

regional conferences. Endo, Par, Mylan, and Sandoz were all NACDS members from 2012 through 2016.

104.    On April 26-29, 2014, the NACDS held its Annual Meeting in Palm Beach, Florida. NACDS describes the Annual Meeting as "the industry's most prestigious gathering of its most influential leaders," and a "classic 'Top-to-Top' business conference" for the pharmaceutical retailing and manufacturing industries. Attendees are provided a list of participating companies in advance, have access to private meeting rooms where executives can meet in person, and can attend a variety of business programs, invitation-only events, and social functions.

105.    The following of Defendants' representatives, among others, attended NACDS's 2014 Annual Meeting:

(a)    **Endo**: Brent Bumpas, National Account Director for Trade; and Scott Littlefield, Trade Director;

(b)    **Mylan**: Joe Duda, President; Hal Korman, Executive VP and Chief Operating Officer; Tony Mauro, Chief Commercial Officer; John Munson, VP of Global Accounts; Robert Potter, Senior VP, North America National Accounts and Channel Development; Rob O'Neill, Head of Generic Sales North America; and Jim Nesta, VP of Sales;

(c)    **Par**: Paul Campanelli, President; Antonio Pera, Chief Commercial Officer; Jon Holden, VP of Sales; Michael Altamuro, VP of Marketing and Business Analytics; and Renee Kenney, Senior VP, Generic Sales;

(d)    **Sandoz**: Peter Goldschmidt, President of Sandoz US and Head,North America; Steven Greenstein, Director of Key Customers; Anuj Hasija, Executive Director for Key Customers; Armondo Kellum, VP of Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; Scott Smith, VP Sales and Marketing.

**FILED WITH REDACTIONS – PUBLIC VERSION**

106.    Executives, senior management, and salespeople from Endo, Par, Mylan, and Sandoz also attended the NACDS Annual Meeting for 2015 and 2016; both events took place at The Breakers resort in Palm Beach, Florida.

107.    In addition to its Annual Meeting, the NACDS hosts its annual "Total Store Expo," which according to the NACDS website, is "the industry's largest gathering of its most influential leaders. It is a combination of both strategic and tactical business meetings between existing and new trading partners and is attended by industry decision makers."

108.    On August 10-13, 2013, the NACDS held its Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. The following representatives of Defendants, among others, attended:

(a)    **Endo**: Brent Bumpas, National Account Director for Trade; Kevin O'Brien, Senior Director of Payer Markets; and Scott Littlefield, Trade Director;

(b)    **Mylan**: Joe Duda, President; Tony Mauro, Chief Commercial Officer; Matt Cestra, Senior Director of Marketing; Martin Fletcher, Senior Director of Commercial Business and Purchasing; Rodney Emerson, Director of Pricing and Contracts; Kevin McElfresh, Executive Director of National Accounts; Mike Aigner, Director of National Accounts; Edgar Escoto, Director of National Accounts; Lance Wyatt, Director of National Accounts; John Baranick, Director of Trade Relations; Robert Potter, Senior VP, North American National Accounts and Channel Development; Heather Paton, VP of Sales for Mylan Institutional; Jeffrey May, VP of North America Product Strategy; Jim Nesta, VP of Sales; and Rob O'Neill, Head of Generic Sales;

(c)    **Par**: Paul Campanelli, President; Gerald Burton, VP of National Accounts; Karen O'Connor, VP of National Accounts; Rick Guillory, VP of National Accounts; Jon Holden, VP of Sales; Michael Altamuro, VP of Marketing and Business Analytics; Christine Caronna, Director of National Accounts; and Renee Kenney, Senior VP, Generic Sales;

(d)    **Qualitest**: Sandra Bayer, Senior Director of National Accounts; Kelly Bachmeier, Director of National Accounts; Walter Busbee, Director of National Accounts; Jeremy Tatum, Director of Market

39

Insights; Lori Minnihan, Associate Director of Trade Pricing Operations; Warren Pefley, VP of Sales and Marketing; Michael Reiney, VP of Purchasing; and Charles Propst, VP;

(e)  **Sandoz**: Peter Goldschmidt, President of Sandoz US and Head, North America; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Armando Kellum, VP of Sales and Marketing; Paul Krauthauser, Senior VP of Sales and Marketing; and Della Lubke, National Account Executive.

109.  On August 23-26, 2014, the NACDS held its Total Store Expo at the Boston Convention Center in Massachusetts. In attendance were the following representatives of Defendants, among others:

(a)  **Endo**: Brent Bumpas, National Account Director for Trade; Kevin O'Brien, Senior Director of Payer Markets; and Scott Littlefield, Trade Director;

(b)  **Mylan**: Joe Duda, President; Tony Mauro, Chief Commercial Officer; Michael Scouvart, Head of North America Marketing; Kevin McElfresh, Executive Director of National Accounts; Mike Aigner, Director of National Accounts; Edgar Escoto, Director of National Accounts; Gary Tighe, Director of National Accounts; Lance Wyatt, Director of National Accounts; John Baranick, Director of Trade Relations; Rameshwan Bhavsar, Manager of Managed Markets Marketing; Robert Potter, Senior VP, North American National Accounts and Channel Development; Heather Paton, VP of Sales for Mylan Institutional; and Jim Nesta, VP of Sales;

(c)  **Par**: Antonio Pera, Chief Commercial Officer; Gerald Burton, VP of National Accounts; Karen O'Connor, VP of National Accounts; Rick Guillory, VP of National Accounts; Jon Holden, VP of Sales; Michael Altamuro, VP of Marketing and Business Analytics; Christine Caronna, Director of National Accounts; and Renee Kenney, Senior VP, Generic Sales;

(d)  **Qualitest**: Sandra Bayer, Senior Director of National Accounts; Kelly Bachmeier, Director of National Accounts; Walter Busbee, Director of National Accounts; Darren Hall, Director of National Accounts; Jeremy Tatum, Director of Market Insights; Lori Minnihan, Associate Director of Trade Pricing Operations; Warren Pefley, VP of Sales and Marketing; Michael Reiney, VP of Purchasing; and Charles Propst, VP;

**FILED WITH REDACTIONS – PUBLIC VERSION**

(e) **Sandoz**: Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Della Lubke, National Account Executive; Scott Smith, VP of Sales and Marketing; Arunesh Verma, Executive Director, Marketing; Sean Walsh, Director, Key Customers

110.    Executives, senior management, and salespeople from Endo, Par, Qualitest, Mylan, and Sandoz also attended the NACDS Total Store Expo on August 22-25, 2015 at the Colorado Convention Center in Denver. And again the following year, high-ranking officers and key sales personnel from Endo, Par, and Mylan, attended the 2016 Total Store Expo on August 19-22 at the San Diego Convention Center in San Diego, California.

111.    In addition to providing an opportunity to share information about the generic pharmaceutical business, these trade association events often include recreational and social activities such as golfing, theater performances, cocktail parties, and dinners, which allowed Defendants' representatives to interact with their competitors privately and outside the traditional business setting.

112.    As uncovered in the state attorneys' general investigation, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business. In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[52]

113.    A large number of generic drug manufacturers, including nearly all Defendants here, are headquartered in close proximity to one another in New York, New Jersey or eastern

---

[52] *See*, *e.g.*, State AG Compl. at ¶¶ 53-60.

41

Pennsylvania, giving them easier and more frequent opportunities to meet and collude. For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, and a few months before Defendants' Amitriptyline products' prices hiked, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

114.    Through these various interactions, Defendants' sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity gives them the opportunity to communicate about bids and pricing strategy, and share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates.

115.    Defendants' common membership in trade associations such as the GPhA and the NACDS, among others, and the participation of industry executives in trade association events and related activities, gave Defendants ample opportunities to exchange information concerning the pricing of their Amitriptyline products and to reach and implement agreements to increase the prices of those products.

### F.    Defendants' own acknowledgments of lack of generic drug competition

116.    Generic pharmaceutical executives frequently spoke publicly about pricing and competition in the market. Members of the industry publicly acknowledged that they saw competition as causing a problem that generally plagued the generic drug industry—namely, low prices—and praised drug markets involving other companies that did not compete on price.

117.    Other pharmaceutical companies viewed Par as a company that also exhibited "rational" behavior and would not compete on price. During Lannett's second quarter 2014 earnings call on February 6, 2014, Lannett's CEO stated "we see Par as one of our rational

FILED WITH REDACTIONS – PUBLIC VERSION

competitors in the marketplace."[53] He elaborated further, saying "we're not troubled by their pricing in the marketplace. Not at all."[54]

### G. Defendants' concerted efforts to increase prices for Amitriptyline yielded supracompetitive profits

118. Defendants' collusive price increases provided them with artificially inflated profits—profits that were funded in part by pharmacy purchases of Amitriptyline.

119. 



---

[53] Lannett Q1 2015 Earnings Call Transcript (Nov. 3, 2014), *available at* https://seekingalpha.com/article/2633575-lannetts-lci-ceo-arthur-bedrosian-on-q1-2015-results-earnings-call-transcript?part=single.

[54] *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION

121. 

122.

123.

124.

H.     **Factors increasing the market's susceptibility to collusion**

125.    Publicly available information on the generic Amitriptyline market in the United States demonstrates that the market is susceptible to cartelization by Defendants. Factors that make



**FILED WITH REDACTIONS – PUBLIC VERSION**

a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) intercompetitor contacts and communication.

### 1.    Industry concentration

126.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

127.    As described above, at the time of the price increases in May 2014 the Defendants controlled the United States generic Amitriptyline market, creating conditions favorable to an effective cartel.

128.    While the market for generic Amitriptyline is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

129.    No departures from the market by manufacturers of generic Amitriptyline can explain the price increases.

130.    Defendants have been able to maintain supracompetitive prices for Amitriptyline without significant loss of market share to non-conspirators. Thus, Defendants have oligopolistic market power in the market for Amitriptyline.

131.    The magnitude of Defendants' price increases for Amitriptyline distinguishes them from non-collusive oligopolistic pricing. Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase. But here the increases are extreme – jumping as much as 1500% over the summer of

2014. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.    Barriers to entry

132.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

133.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Amitriptyline market that make such entry time-consuming and expensive. Among other things, prospective generic manufacturers must establish manufacturing processes sufficient to safely produce large amounts of bioequivalent product. The manufacturing facilities must follow the FDA's rigorous Current Good Manufacturing Practice regulations. Par's own 2014 Form 10-K states that its business is to develop and commercialize "generic drugs with limited competition, high barriers to entry and longer life cycles."[61]

134.    In addition to the substantial out-of-pocket costs required to bring a drug to market, the approval process for generic drugs is lengthy. As Senator Jerry Moran of Kansas commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[62]

---

[61] Par Pharmaceutical Companies, Inc., SEC 2014 Form 10-K at 13 (March 13, 2015), *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.
[62] Sen. Jerry Moran Opening Statement, Prioritizing Public Health: The FDA's Role in the Generic Drug Marketplace (Sept. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices as a result of the conspiracy.

### 3. Inelastic demand

135.    A product exhibits completely inelastic demand if buyers will continue to buy it regardless of the price. No product is completely inelastic, but prescription medicines come close. Demand for Defendants' Amitriptyline products is inelastic largely because, while they are somewhat interchangeable with one another, they cannot be substituted for other products given their pharmacological characteristics. Amitriptyline is a medical necessity for millions of people who suffer symptoms of depression as well as chronic pain from migraine headaches. Left untreated, symptoms of clinical depression and chronic pain treated by Amitriptyline can rapidly worsen, delaying or impeding recovery for those with serious health conditions. The result in such circumstances is often drug or alcohol dependency, chronic lack of sleep, and/or failing personal relationships and professional performance. This inelastic demand gave Defendants significant pricing power, as well as an incentive to collude

136.    Additionally, the incentives of actors in the Amitriptyline market are not sensitive to price, as they are in most other markets. Doctors who prescribe Amitriptyline have the best therapy and not the cheapest cost in mind; patients cannot write themselves a prescription for a cheaper substitute or comfortably forgo treatment; and pharmacies have no choice but to fill the prescription as written. When Defendants increased their Amitriptyline prices, independent pharmacies could not simply purchase and dispense less-expensive alternative products.

137.    In order for a cartel to profit from raising prices above competitive levels, demand must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining sales,

as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

### 4.    Lack of substitutes

138.    While other tricyclic antidepressants on the market seek to treat similar conditions, Amitriptyline is often the only effective medicine that is reasonably available or medically suitable to patients in need.

139.    Amitriptyline is also differentiated from other drug products because of its regulatory status. A generic drug is considered a therapeutic equivalent of—and AB-rated with respect to—the Reference Listed Drug (RLD) (often the brand name version of a drug). Defendants' Amitriptyline products are not therapeutically equivalent to—or AB-rated with respect to—other drug products, even similar ones. Thus, a patient prescribed Amitriptyline could not purchase a different drug using his or her Amitriptyline prescription, regardless of the respective prices of the drugs.

140.    In addition, the branded version of Amitriptyline does not serve as economic substitute for generic versions of Amitriptyline because branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar. In addition, Elavil—the branded version of Amitriptyline—was discontinued by AstraZeneca in 2003.

141.    Thus, purchasers of generic Amitriptyline are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

FILED WITH REDACTIONS – PUBLIC VERSION

### 5.      Standardized product with high degree of interchangeability

142.     A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

143.     Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug. This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

144.     Defendants' Amitriptyline products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them for branded products, and for one another.

145.     Moreover, because Amitriptyline products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service. Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds. The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[63] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

---

[63] *See, e.g.,* GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

**FILED WITH REDACTIONS – PUBLIC VERSION**

### 6.   Inter-competitor contacts and communications

146.    As detailed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ████████ NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[64]

147.    The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

148.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications. These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[65] The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that

---

[64] PaRR Report.
[65] State AG Amended Compl. ¶ 7.

**FILED WITH REDACTIONS – PUBLIC VERSION**

facilitate collusion. In addition to the Defendants named in this Complaint, the following companies have also been identified as targets of government investigations:

(a)  **Actavis**: In February 2016, Actavis's predecessor, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[66]

(b)  **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to the DOJ's generic drug investigation.[67] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[68]

(c)  **Citron**: In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[69]

(d)  **Dr. Reddy's**: In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[70]

(e)  **Heritage**: As a private company, Heritage is not required to make public disclosures. Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[71]

---

[66] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at 27, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

[67] Zeba Siddiqui, "India's Aurobindo shares hit nine-month low on US price-fixing lawsuit," Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[68] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[69] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[70] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[71] Tom Schoenberg , David McLaughlin & Sophia Pearson, "U.S. Generic Drug Probe Seen Expanding After Guilty Pleas," Bloomberg (Dec. 14, 2016), *available at*

51

and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[72]

(f)  **Impax**: In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[73] In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[74] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular… digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[75]

(g)  **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[76] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[77] On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain

https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[72] *See supra* ¶19.

[73] Impax SEC Form 8-K (July 15, 2014), *available at*
https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[74] Impax SEC Form 8-K (Nov. 6, 2014), *available at*
https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm

[75] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at*
https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[76] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

[77] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at*
https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

FILED WITH REDACTIONS – PUBLIC VERSION

products, generally for the period of 2005 through the dates of the subpoenas."[78]

(h)   **Mayne**: On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic drugs" and that it had received a subpoena from the Connecticut AG seeking similar information.[79] On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[80]

(i)   **Perrigo**: On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[81]

(j)   **Sun**: On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents…relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[82]

(k)   **Taro**: In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic

---

[78] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, *available at* http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[79] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

[80] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

[81] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[82] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

53

pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[83]

(l)   **Teva**: In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[84]

(m)   **Zydus**: Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[85]

## IX.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.   The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy

149.   Plaintiffs had no knowledge of the conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Amitriptyline. And indeed, Defendants' disclosures regarding the government investigations did not indicate Amitriptyline specifically.

150.   Plaintiffs had no direct contact or interaction with any of the Defendants in this case and had no means by which they could have discovered Defendants' conspiracy.

---

[83] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[84] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

[85] *See* Rupali Mukherjeel, "US polls, pricing pressure may hit Indian pharma cos," The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

54

151.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

(a)    Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[86]

(b)    Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[87]

(c)    Novartis's (the parent of Sandoz) Code of Conduct provides: "We are committed to fair competition and will not breach competition laws and regulations."[88]

152.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

153.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.    Fraudulent concealment tolled the statutes of limitations**

154.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.

155.    Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Amitriptyline. The concealed, suppressed, and omitted facts would have been

---

[86] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf.

[87] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

[88] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

55

important to Plaintiffs and members of the Classes as they related to the cost of Amitriptyline they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Amitriptyline. Defendants' false statements and conduct concerning the prices of Amitriptyline were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing Amitriptyline at prices established by a free and fair market.

### 1.    Active concealment of the conspiracy

156.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

157.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. Public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for Amitriptyline.

158.    As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through

the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[89]

### 2. Plaintiffs exercised reasonable diligence

159.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the market to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

160.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

161.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

162.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

### X.     CONTINUING VIOLATIONS

163.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. As shown in the price charts

---

[89] State AG Amended Compl. ¶ 13.

FILED WITH REDACTIONS – PUBLIC VERSION

above, Defendants continue to benefit from the effects of the conspiratorial price increases, as prices have not returned to the stable levels seen before the steep increases. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XI.   DEFENDANTS' ANTITRUST VIOLATIONS

164.   During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for Amitriptyline sold in the United States.

165.   In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Amitriptyline sold in the United States. These activities included the following:

> (a)   Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of Amitriptyline in the United States;
>
> (b)   Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to allocate customers or rig bids for Amitriptyline sold in the United States;
>
> (c)   Agreeing during those meetings, conversations, and communications to allocate customers for Amitriptyline sold in the United States;
>
> (d)   Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Amitriptyline sold in the United States;
>
> (e)   Submitting bids, withholding bids, and issuing price proposal in accordance with the agreements reached;

58

FILED WITH REDACTIONS – PUBLIC VERSION

(f)     Selling Amitriptyline in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for Amitriptyline sold in the United States at collusive and noncompetitive prices.

166.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

167.     During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased Amitriptyline at inflated and supracompetitive prices.

168.     Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

169.     As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for Amitriptyline than they would have paid in competitive markets.

170.     General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to independent pharmacists, who cannot negotiate their acquisition costs. Wholesalers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Amitriptyline.

FILED WITH REDACTIONS – PUBLIC VERSION

171.    The unlawful contract, combination and conspiracy has had the following effects, among others:

    (a)    price competition in the market for Amitriptyline has been artificially restrained;

    (b)    prices for Amitriptyline sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

    (c)    purchasers of Amitriptyline sold by Defendants have been deprived of the benefit of free and open competition in the market for Amitriptyline.

## XII.   CLASS ACTION ALLEGATIONS

172.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All privately held pharmacies in the United States and its territories that purchased Defendants' generic Amitriptyline products (including 10, 25, 50, 75, 100 and 150 mg tablets) from May 1, 2014 through the present.

> This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

173.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[90] on

---

[90] The IRP Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North

FILED WITH REDACTIONS – PUBLIC VERSION

behalf of the following class (the "Damages Class"):

> All privately held pharmacies in the IRP Damages Jurisdictions that indirectly purchased Defendants' generic Amitriptyline products (including 10, 25, 50, 75, 100 and 150 mg tablets) from May 1, 2014 through the present.[91]

> This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

174.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

175.    While Plaintiffs do not know the exact number of the members of the Classes, rosters of members of national independent pharmacy organizations indicate that there are at least 20,000 members in each class.

176.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

> (a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Amitriptyline and/or engaged in market allocation for generic Amitriptyline sold in the United States;

> (b)    The identity of the participants of the alleged conspiracy;

---

Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

[91] Plaintiffs may seek to certify state classes rather than a single Damages Class. See ¶ 182.

**FILED WITH REDACTIONS – PUBLIC VERSION**

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of generic Amitriptyline sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Amitriptyline, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

177.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Amitriptyline products sold by Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

FILED WITH REDACTIONS – PUBLIC VERSION

178.     Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

179.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

180.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the IRP Damages Jurisdictions or as separate classes for certain groups of IRP Damages Jurisdictions, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

181.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

FILED WITH REDACTIONS – PUBLIC VERSION

## XIII.   CAUSES OF ACTION

### FIRST COUNT

### Violation of Sections 1 and 3 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

182.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

183.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

184.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Amitriptyline, thereby creating anticompetitive effects.

185.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Amitriptyline.

186.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Amitriptyline have been harmed by being forced to pay inflated, supracompetitive prices for generic Amitriptyline.

187.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

188.    Defendants' conspiracy had the following effects, among others:

FILED WITH REDACTIONS – PUBLIC VERSION

(a)     Price competition in the market for generic Amitriptyline has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for generic Amitriptyline provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiffs and members of the Nationwide Class have been deprived of the benefits of free and open competition.

189.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Amitriptyline sold by Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

190.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

191.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[92]
### (on behalf of Plaintiffs and the Damages Class)

192.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

193.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Amitriptyline in

---

[92] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, Connecticut, District of Columbia, ~~Illinois~~, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

FILED WITH REDACTIONS – PUBLIC VERSION

unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

194.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Amitriptyline and to allocate customers for generic Amitriptyline in the United States.

195.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

> (a)     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Amitriptyline at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Amitriptyline provided in the United States; and

> (b)     participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

196.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Amitriptyline. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

197.     In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and the members of the Damages Class.

198.     Accordingly, Plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled

or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

199.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

200.    **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Amitriptyline was restrained, suppressed, and eliminated throughout Alabama; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, et seq.

201.    **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, et seq. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Amitriptyline was restrained, suppressed, and eliminated throughout Arizona; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, et seq.

FILED WITH REDACTIONS – PUBLIC VERSION

Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, et seq.

202.    **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Amitriptyline at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Amitriptyline. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Amitriptyline. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Amitriptyline has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Amitriptyline provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Amitriptyline indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Amitriptyline than they otherwise would have paid in

the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including reasonable attorney's fees, pursuant to California Business and Professions Code § 16750(a).

203.    **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, et seq. Defendants' combination and conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Amitriptyline in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Amitriptyline in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Amitriptyline, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, et seq.

FILED WITH REDACTIONS – PUBLIC VERSION

204.   ~~**Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.~~[93]

205.   **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, et seq.

206.   **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, et seq. Defendants' combined capital, skills

---

[93] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

70

or acts for the purposes of creating restrictions in trade or commerce of generic Amitriptyline, increasing the prices of generic Amitriptyline, preventing competition in the sale of generic Amitriptyline, or binding themselves not to sell generic Amitriptyline, in a manner that established the price of generic Amitriptyline and precluded free and unrestricted competition among themselves in the sale of generic Amitriptyline, in violation of Kan. Stat. Ann. § 50-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, et seq.

207.    **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, et seq.

71

208. **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, et seq.

209. **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, et seq.

FILED WITH REDACTIONS – PUBLIC VERSION

210.     **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, et seq. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, et seq.

211.     **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the

73

foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, et seq.

212.    **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, et seq.

213.    **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in

FILED WITH REDACTIONS – PUBLIC VERSION

restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, et seq.

214.   **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, et seq.

215.   **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340, et seq. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, et seq.

216.    **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

217.    **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the

Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, et seq.

218.   **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, et seq.

219.   **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful

FILED WITH REDACTIONS – PUBLIC VERSION

conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, et seq.

220.    **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, et seq.

221.    **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct

78

and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, et seq.

222.   **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, et seq.

223.   **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in

FILED WITH REDACTIONS – PUBLIC VERSION

their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, et seq.

224.  **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, et seq.

225.  **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, et seq. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Amitriptyline prices were raised,

fixed, maintained and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, et seq.

225a. **Connecticut:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-26 and § 35-28. Defendants' combination or conspiracy described above had the following effects during the class period: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Amitriptyline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 10, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Conn. Gen. Stat. § 35-34 and § 35-35. Plaintiffs have provided a copy of this complaint to the Attorney General as required by Conn. Gen. Stat. § 35-37.

225b. **Maryland:** Defendants have "unreasonably restrain[ed] trade" by "contract, combination or conspiracy" in violation of Md. Code, Com. Law § 11-204(a)(1). During the class period, throughout Maryland, Defendants' combination or conspiracy restrained, suppressed, and eliminated price competition for generic Amitriptyline and raised, fixed, maintained, and stabilized

81

generic Amitriptyline prices at artificially high levels. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after October 1, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Md. Code, Com. Law § 11-209(b).

226.    **As to all jurisdictions above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Amitriptyline than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

227.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

228.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD COUNT**

FILED WITH REDACTIONS – PUBLIC VERSION

**Violation of State Consumer Protection Statutes[94]**
**(on behalf of Plaintiffs and the Damages Class)**

229.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

230.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

231.    **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, et seq. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or

---

[94] Statutory consumer protection/deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, ~~Georgia, Michigan~~, Minnesota, Nebraska, ~~Nevada~~, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, ~~South Carolina~~, South Dakota, ~~West Virginia~~, Wisconsin and the U.S. Virgin Islands.

FILED WITH REDACTIONS – PUBLIC VERSION

deceptive acts or practices in violation of Alaska Stat. § 45.50.471, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

232.    **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, et seq. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants increased prices of Amitriptyline, a medical supply, by 10% or more during the 30 days following a declaration of a state of emergency in Arkansas, which constitutes an unfair or deceptive act or practice in violation of A.C.A. § 4-88-303 *et seq.*[95] The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation

---

[95] States of emergency for Arkansas were declared on at least January 3, 2013; January 17, 2014; March 3, 2014; April 28, 2014; and February 18, 2015; and September 8, 2015.

**FILED WITH REDACTIONS – PUBLIC VERSION**

of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

233.    **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Amitriptyline in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, et seq. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, et seq., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, et seq. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, et seq. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Amitriptyline in the State of California within the meaning of § 17200, California Business and Professions Code; (4) Defendants' acts and practices are fraudulent or

85

deceptive within the meaning of § 17200 of the California Business and Professions Code; and (5) Defendants unlawfully raised prices of Amitriptyline, a medical supply, by more than 10% during the 30 days following a declaration of a state of emergency in California, in violation of the California Penal Code § 396, thereby committing "unlawful" and "unfair" prohibited business practices under § 17200.[96] Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Amitriptyline. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all

---

[96] States of Emergency for California were declared on at least August 22, 2012; July 12, 2013; August 9, 2013; August 22, 2013; August 23, 2013; September 20, 2013; September 30, 2013; October 31, 2013; January 17, 2014; April 29, 2014; May 14, 2014; August 2, 2014; August 24, 2014; September 17, 2014; December 22, 2014; May 19, 2015; May 20, 2015; July 22, 2015; July 31, 2015; September 11, 2015; September 13, 2015; December 18, 2015; February 1, 2016; February 19, 2016; April 19, 2016; June 7, 2016; June 24, 2016; July 26, 2016; July 9, 2016; and August 16, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

234. **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, et seq. Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, et seq., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

235. **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for

generic Amitriptyline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Amitriptyline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Amitriptyline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Amitriptyline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

236. **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Defendants have engaged in unfair competition or unfair or

deceptive acts or practices in violation of Florida Stat. § 501.201, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

~~237.~~ **Georgia:** ~~Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Amitriptyline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Amitriptyline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Amitriptyline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Amitriptyline at prices set by a free and fair market. Defendants'~~

misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.[97]

238. **Michigan:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Amitriptyline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Amitriptyline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative

---

[97] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

~~misrepresentations and omissions concerning the price of generic Amitriptyline, likely misled all~~
~~purchasers acting reasonably under the circumstances to believe that they were purchasing generic~~
~~Amitriptyline at prices set by a free and fair market. Defendants' misleading conduct and~~
~~unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, et seq., and,~~
~~accordingly, Plaintiffs and members of the Damages Class seek all relief available under that~~
~~statute.~~

239.   **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, et seq. Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, et seq., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

240.   **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, et seq. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout

Nebraska; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed generic Amitriptyline in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

241.   **Nevada:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Amitriptyline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Amitriptyline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by

92

~~Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Amitriptyline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Amitriptyline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.~~

242.    **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, et seq. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Amitriptyline in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

243.    **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and

non-competitive levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Amitriptyline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Amitriptyline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Amitriptyline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Amitriptyline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

244. **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at

which generic Amitriptyline were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Amitriptyline as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Amitriptyline because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Amitriptyline, including their illegal conspiracy to secretly fix the price of generic Amitriptyline at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Amitriptyline. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal

FILED WITH REDACTIONS – PUBLIC VERSION

conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

245.   **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Amitriptyline were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Amitriptyline that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Amitriptyline; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York Class Members who indirectly purchased generic Amitriptyline were misled to believe that they were paying a fair price for generic Amitriptyline or the price increases for generic Amitriptyline were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Amitriptyline would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to

FILED WITH REDACTIONS – PUBLIC VERSION

pricing generic Amitriptyline would have a broad impact, causing class members who indirectly purchased generic Amitriptyline to be injured by paying more for generic Amitriptyline than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Amitriptyline in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Amitriptyline in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

246.    **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Amitriptyline were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up

97

their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Amitriptyline created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. Defendants charged "unreasonably excessive" prices for Amitriptyline, which is a good "consumed or used to preserve, protect, or sustain life, health, safety, or economic well-being of persons or their property," in the 45 days following a declaration of a state of emergency by the Governor, in violation of North Carolina. Gen..Stat. § 75-38 and § 75-1.1.[98] The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed

---

[98] States of Emergency for North Carolina were declared on at least October 29, 2012; March 12, 2013; June 14, 2013; September 12, 2013; January 28, 2014; February 11, 2014; April 28, 2014; July 2, 2014; January 26, 2015; February 16, 2015; February 25, 2015; and October 1, 2015; January 20, 2016; and February 17, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

generic Amitriptyline in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Amitriptyline in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

247.   **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Amitriptyline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Amitriptyline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and

99

proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Amitriptyline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Amitriptyline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

248. **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or

FILED WITH REDACTIONS – PUBLIC VERSION

~~practices in violation of S.C. Code Ann. § 39-5-10, et seq., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.~~[99]

249.    **South Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Amitriptyline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Amitriptyline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Amitriptyline,

---

[99] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

**FILED WITH REDACTIONS – PUBLIC VERSION**

likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Amitriptyline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Amitriptyline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

250. **West Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Amitriptyline. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Amitriptyline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of

~~unconscionable and deceptive commercial practices as set forth above. That loss was caused by~~
~~Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including~~
~~their affirmative misrepresentations and omissions concerning the price of generic Amitriptyline,~~
~~likely misled all purchasers acting reasonably under the circumstances to believe that they were~~
~~purchasing generic Amitriptyline at prices set by a free and fair market. Defendants' affirmative~~
~~misrepresentations and omissions constitute information important to Plaintiffs and members of~~
~~the Damages Class as they related to the cost of generic Amitriptyline they purchased. Defendants~~
~~have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va.~~
~~Code § 46A-6-101, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek~~
~~all relief available under that statute.~~[100]

251.   **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Amitriptyline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce

---

[100] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

**FILED WITH REDACTIONS – PUBLIC VERSION**

and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Amitriptyline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Amitriptyline at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Amitriptyline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

252. **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Amitriptyline were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Amitriptyline. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Amitriptyline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Amitriptyline price competition was restrained,

104

suppressed, and eliminated throughout U.S.V.I.; (2) generic Amitriptyline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Amitriptyline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Amitriptyline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Amitriptyline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## **FOURTH COUNT**

### **Unjust Enrichment[101]**
### **(on behalf of Plaintiffs and the Damages Class)**

253.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

---

[101] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North

FILED WITH REDACTIONS – PUBLIC VERSION

254.   To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.

255.   Defendants have unlawfully benefited from their sales of generic Amitriptyline because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held pharmacies, who purchased generic Amitriptyline at prices that were more than they would have been but for Defendants' unlawful actions.

256.   Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

257.   Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

258.   Defendants have been enriched by revenue resulting from unlawful overcharges for generic Amitriptyline while Plaintiffs have been impoverished by the overcharges they paid for generic Amitriptyline imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

259.   There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

---

Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

FILED WITH REDACTIONS – PUBLIC VERSION

260.     Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

261.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Amitriptyline.

262.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Amitriptyline are ascertainable by review of sales records.

263.      It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Amitriptyline.

264.     It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Amitriptyline, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

265.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Amitriptyline is a direct and proximate result of Defendants' unlawful practices.

266.     The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

FILED WITH REDACTIONS – PUBLIC VERSION

267.     It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Amitriptyline derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

268.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Amitriptyline prices remain inflated above pre-conspiracy levels.

269.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Amitriptyline.

270.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to purchases of generic Amitriptyline by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## XIV.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment for the following relief:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section

1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

109

**FILED WITH REDACTIONS – PUBLIC VERSION**

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XV.    JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 1, 2019                                    Respectfully submitted,

                                                        */s/ Jonathan W. Cuneo*

Peter Gil-Montllor                              Jonathan W. Cuneo
Christian Hudson                                Joel Davidow
**CUNEO, GILBERT & LADUCA LLP**                 Daniel Cohen
16 Court Street, Suite 1012                     Victoria Romanenko
Brooklyn, NY 11241                              Blaine Finley
202-789-3960                                    **CUNEO, GILBERT & LADUCA LLP**
pgil-montllor@cuneolaw.com                      4725 Wisconsin Ave., NW Suite 200
                                                Washington, DC 20016
                                                202-789-3960
                                                jonc@cuneolaw.com

                                                *Lead Counsel for the Indirect Reseller Plaintiffs*

FILED WITH REDACTIONS – PUBLIC VERSION